# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| MATTHEW J. CLEMENTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:23-cv-00831** |
| | ) | **Judge Aleta A. Trauger** |
| MERCURY AIR CENTER-NASHVILLE, | ) | |
| LLC d/b/a ATLANTIC AVIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Before the court is the Motion for Partial Summary Judgment (Doc. No. 20), filed by defendant Mercury Air Center-Nashville, LLC d/b/a Atlantic Aviation ("Atlantic" or "Atlantic-BNA"), seeking dismissal of the plaintiff's claims for negligent misrepresentation, bailment, and violation of the Tennessee Consumer Protection Act, as well as some of the plaintiff's claims for damages. The defendant concedes that material factual disputes preclude summary judgment on the plaintiff's negligence and breach of contract claims.

For the reasons set forth herein, the defendant's motion will be granted in part and denied in part. Specifically, the court finds that summary judgment is not warranted on the bailment claim.

## I.      LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.     FACTS[1]

Plaintiff Matthew J. Clemente, a resident of Troy, New York, owns a 1968 DeHavilland DHC2 Beaver MKII airplane, serial number 1690TB58, FAA registration N258PA ("the aircraft").

---

[1] Unless otherwise indicated, the facts set forth herein are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 22-1) and are undisputed, at least for purposes of the Motion for Partial Summary Judgment.

Atlantic operates a fixed base operation ("FBO") at Nashville International Airport ("BNA") and is in the business of providing aviation services, including fuel, parking, and hangar space.

On July 5, 2022, Clemente flew the aircraft to BNA to attend a conference in Nashville. After landing at BNA, Clemente parked the aircraft at Atlantic's FBO. Prior to his arrival, Clemente had not made any prearrangement or reservation with Atlantic to park his aircraft at Atlantic's FBO. (Doc. No. 20-4, Clemente Dep. 40.)

Upon arriving at BNA, Clemente taxied to Atlantic's FBO, where he was greeted by an Atlantic employee. The plaintiff testified that he had rolled his window down and stopped the plane in order to speak to the Atlantic employee. He asked if he could tie the plane down but was told, "No, you have to park it here." (*Id.* at 31.) The employee told Clemente where to park the plane. When Clemente repeated, "I need this plane tied down," the employee responded, "Leave it here. We're going to take care of you." (*Id.*) After the plaintiff parked and exited the plane, he spoke with two other members of Atlantic's line crew, Shawn Leden and Heath Chandler R. [sic],[2] to whom he repeated his instructions that the aircraft be tied down so that it would be secure in the event of bad weather. (*Id.*) Clemente testified that he tipped the men $50 each and believed that they understood how to tie down his aircraft, but he also did not believe that they were really paying attention to him. (*Id.* at 31–32.) When he went inside, he found a supervisor to whom he reiterated his request that his aircraft be tied down. (*Id.* at 32.)

Supervisor Michael Shadowens recalled speaking with Clemente in the Atlantic lobby, but only about fueling and towing. (Shadowens Statement, Doc. No. 20-2 at 2.)[3] Shawn Leden recalled

---

[2] This witness signed his name and is referred to in the defendant's court filings as "Heath Chandler R." (*See, e.g.*, Doc. No. 20-1 at 4; Doc. No. 21 at 2.) In the absence of any indication as to what his last name actually is, the court also refers to him as "Heath Chandler R."

[3] The defendant relies upon written Witness Statements provided by Shawn Leden, Heath Chandler R., Tiffani Davis, and Michael Shadowens, all of which were filed as attachments to the

that Clemente had provided detailed information about how to tow and refuel the aircraft and had "mention[ed] . . . tie downs," but Leden did not remember a "definite confirmation" about them. (Leden Witness Statement, Doc. No. 20-1 at 3.) Heath Chandler R. similarly remembered that Clemente "mention[ed] about the tie down straps in his aircraft" and talked "vaguely of parking requests," before going into great detail about how to refuel the aircraft. (Heath Chandler R. Witness Statement, Doc. No. 20-1 at 4.) Heath Chandler R. stated that he "made the call to front desk" to relay what Clemente had told him about parking before he got busy doing other things. (*Id.*) He "assumed" that Clemente had "explained his concerns to [the] front desk." (*Id.*) The next day, he noticed that "the plane had been triple-chocked and coned on all sides on Hill 3," and he believed at that point that Clemente had "changed his mind" about tie-downs and opted to have the plane "triple-chocked" instead.[4] (*Id.*) Tiffani Davis, Atlantic's front-desk clerk, also remembered Clemente requesting refueling but did not specifically recall his requesting a tie-down. (Davis Witness Statement, Doc. No. 20-1 at 2.)

The aircraft was not tied down. Two days later, on July 7, 2022, an extreme weather event struck BNA, causing the aircraft to move from its parked location into a fence, as a result of which it incurred significant damage (the "incident"). According to the BNA Incident Report, a witness to the incident described seeing the wind "lift[] the right wing causing the aircraft to jump the [chocks] and start[] rolling back on its own," coming "to a complete stop when it hit the out

---

Declaration of Aaron Wood, General Manager of Atlantic BNA. (Doc. No. 20-8, Wood Decl. ¶¶ 3–4.) According to Wood, the Statements were created and maintained in the regular course of Atlantic's business. (*Id.* ¶ 5.)

[4] Chocks are wedges placed around an aircraft's wheels to prevent accidental movement on the ground. *See* https://www.globeair.com/g/chock (last visited May 9, 2025); *see also* https://www.merriam-webster.com/dictionary/chock (last visited May 9, 2025). The court presumes that "triple-chocked" means that all three sets of the aircraft's wheels were chocked.

perimeter fence." (BNA Incident Report, Doc. No. 20-3 at 2.) The damage to the aircraft rendered it no longer airworthy.

Clemente testified that he believed Atlantic's employees did not tie down the aircraft because of "complete laziness" and because "[t]hey were so busy with multi-million dollar jets coming into Nashville, they don't have time for a little old antique airplane . . . I just don't think they had time to take care of it." (Clemente Dep. 56.)

Clemente did not enter into any kind of written agreement with Atlantic before leaving his aircraft at the FBO. However, when he left the aircraft, Atlantic took a "credit card swipe" from him. (*Id.* at 43.) The normal procedure is to pay the tie-down and ramp fee upon departure, along with the cost of refueling. (*Id.*) After the incident, Atlantic did not end up charging or billing Clemente for its services at the FBO (*id.*), presumably because of the damage to the aircraft. The plaintiff testified that he could have returned to Atlantic at any point to get his plane and that nothing prevented him from doing so. (*Id.* at 53–55; *see id.* at 53 ("No, that's true at any airport. It is your property, and they are the FBO. As long as you're willing to pay the bill, they are going to let you fly away at any time from an FBO.").)

After the incident, the aircraft was transported to a specialized facility in Minnesota for repairs. The plaintiff has received a repair estimate from the facility totaling $335,721.72. The repairs are apparently underway but have not yet been completed.

Clemente purchased the aircraft in 2003, at which time it was appraised as having a fair market value of $359,720. Since then, the plaintiff has not obtained another appraisal of the aircraft. He testified, however, that, if it were appraised today, he believed it would be valued at "well over 1.3, 1.4 million [dollars]." (Clemente Dep. 23.) The "guy who is rebuilding it" offered "1.3 million for it just as it sits [in parts] on the floor." (*Id.*) He further testified that "this airplane

has gone up in value significantly since the accident." (*Id.* at 86.) Asked if he was "making a claim that the aircraft has sustained diminished value due to the damage to it," Clemente responded that, once repaired, the aircraft "will have regained its entire value of what it was worth. . . . So we hope that with the restoration it will not affect any of the overall value of the airplane when it is completed." (*Id.*; *see id.* at 87 ("So once it is restored then we're going to be good, because there's a shortage of [these airplanes].").)

Asked about whether he was seeking damages for the loss of use of the aircraft while it is being repaired, Clemente testified that he and his family have forgone making trips they would have taken, and he has "miss[ed] opportunities" by not attending conferences he would have attended, if they had had access to the aircraft, but he has not rented or used any other planes to take these trips. (*Id.* at 85.) He also never chartered or rented the aircraft before the incident, so he has not lost income from being unable to charter it. (*Id.* at 82.)

## III. PROCEDURAL HISTORY

Clemente filed suit in Tennessee state court on June 30, 2023, asserting causes of action for (1) negligence, (2) negligent misrepresentation, (3) violation of the Tennessee Consumer Protection Act ("TCPA"), (4) breach of contract, and (5) bailment. (*See generally* Doc. No. 1-1 at 2–8, Compl.) He seeks damages in excess of $350,000 for repairs to the aircraft, as well as compensation for the diminution in the aircraft's value as a result of its having suffered "major damage" and for loss of the use of the aircraft during repairs. (*Id.* ¶ 23.) He also seeks treble damages and attorney's fees under the TCPA.

Atlantic removed the case to federal court based on diversity jurisdiction. Having concluded discovery, Atlantic now seeks partial summary judgment. (Doc. No. 20.) It acknowledges that material factual disputes preclude summary judgment on the plaintiff's negligence and breach of contract claims, but it asserts that the negligent misrepresentation, TCPA,

and bailment claims fail as a matter of law. (Doc. No. 20.) Atlantic also asserts that it is entitled to partial summary judgment on the plaintiff's damages claims arising from his purported loss of use of the aircraft and the aircraft's diminution in value. With its motion, Atlantic filed a Memorandum in Support, Statement of Undisputed Material Facts ("SUMF"), and the evidentiary material on which the SUMF relies. (Doc. Nos. 20-1 through -10, 21, 22.)

The plaintiff filed a cursory Brief in Opposition to the Motion for Summary Judgment (Doc. No. 22-2) and a Response to the SUMF (Doc. No. 22-1), in which he does not actually dispute any of the operative facts. The defendant filed a Reply, Reply to the Response to the SUMF, and a supplemental Declaration (Doc. Nos. 23, 23-1, 23-2), arguing primarily that the plaintiff's response briefing was filed outside the time limit provided by Local Rule[5] and that the plaintiff has failed to establish the existence of any material factual dispute.

## IV.    DISCUSSION

The issues presented are whether the plaintiff has presented sufficient facts to support, as a matter of law, his claims for negligent misrepresentation, violation of the TCPA, or bailment, and whether he may prove entitlement to damages to compensate him for loss of use or diminution in value under Tennessee law.

### A.    Negligent Misrepresentation

To prove a negligent misrepresentation claim under Tennessee law, the plaintiff must show that

(1) the defendant was acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; (2) the defendant supplied faulty information meant to guide

_____

[5] The court will not address this argument other than by noting that the defendant suffered no prejudice arising from the plaintiff's filing his response two days late. In any event, the court would reach the same ruling herein without consideration of the plaintiff's briefing, which adds little to the analysis.

others in their business transactions; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied upon the information.

*W. Silver Recycling, Inc. v. ProTrade Steel Co., LTD.*, 476 F. Supp. 3d 667, 682 (M.D. Tenn. 2020) (citing *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997)). The "faulty information" must "consist[] of statements of a material past or present fact." *Pryority P'ship v. AMT Props., LLC*, No. E2020-00511-COA-R3-CV, 2021 WL 915607, at *3 (Tenn. Ct. App. Mar. 10, 2021) (citing *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)). As a result, "the tort of negligent misrepresentation cannot be based on statements of opinion or representations of future events." *Id.* (citing *McElroy*, 632 S.W.2d at 130); *see also Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978) ("[A] misrepresentation of intention or a promise without intent to perform is legally insufficient to support a claim for rescission or damages.").[6]

Clemente's negligent misrepresentation claim is premised upon his allegations that Atlantic's employees told him that the aircraft would be tied down but that they failed to tie down the aircraft as promised, from which the plaintiff concludes that they were "negligent in telling [him] that the aircraft would be tied down." (Compl. ¶¶ 30–32.) Atlantic asserts that it is entitled

---

[6] Conversely, a claim for promissory fraud may be based on a misrepresentation that "embod[ies] a promise of future action without the present intention to carry out the promise." *Carter v. Patrick*, 163 S.W.3d 69, 77 (Tenn. Ct. App. 2004) (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). However, "'the mere fact that the promisor failed to perform the promised act is insufficient by itself to prove fraudulent intent.' This is because . . . '[n]ot every broken promise starts with a lie.'" *Styles v. Blackwood*, No. E2007-00416-COA-R3-CV, 2008 WL 5396804, at *7 (Tenn. Ct. App. Dec. 29, 2008) (quoting *Am. Cable Corp. v. ACI Mgmt., Inc.*, No. M1997-00280-COA-R3-CV, 2000 WL 1291265, at *5 (Tenn. Ct. App. Sept. 14, 2000)); *see also Isaac v. Ctr. For Spine, Joint, & Neuromuscular Rehab., P.C.*, No. M2010-01333-COA-R3-CV, 2011 WL 2176578, at *6 (Tenn. Ct. App. June 1, 2011) ("[A] claim that is supported by nothing more than the plaintiff's 'subjective belief' and his unspecified 'information' in support of the claim of fraudulent intent to deceive and not to undertake performance" is insufficient." (citation omitted)). The Complaint in this case does not purport to state a claim for promissory fraud, nor has the plaintiff offered any evidence to support the conclusion that any Atlantic employee made promises with the intent not to keep them.

to judgment as a matter of law on this claim because "there is no evidence that any alleged representation that Atlantic would tie down Plaintiff's aircraft was false" at the time it was made or that it was "anything more than a statement as to future events." (Doc. No. 21 at 8.) The plaintiff, in fact, testified that he believed that the only reason his aircraft was not tied down was "[c]omplete laziness," "[s]trictly laziness." (Clemente Dep. 56.)

In his Brief in Opposition to the Motion for Summary Judgment, the plaintiff now claims that the "[n]egligent misrepresentation occurred when plaintiff was told that the aircraft would be tied down but defendant did not have tie down services." (Doc. No. 22-2 (citing Clemente Dep. 99).) The cited portion of the plaintiff's deposition testimony is not clear, but the plaintiff appears to be saying that he was told at some point by some new employee named Aaron that Atlantic did not offer tie-down services, even though everyone else had told him that it did. (*See* Clemente Dep. 99 ("And the guy who was representing them, named Aaron, it was his first week at work. I don't know if he had knowledge if there were tie-downs or not. So when he said there were no tie-downs, how would he even know? He just got there. He told me he just started his job. And yet everybody else told me there were tie-downs there.").)

The defendant has presented the Supplemental Declaration of Aaron Wood, *General Manager* of Atlantic BNA, to respond to the plaintiff's vague testimony and new theory of recovery on negligent misrepresentation. Wood attests that he began working for Atlantic at the Nashville FBO in April 2022, a few months before the incident. (Doc. No. 20-8, Wood Suppl. Decl. ¶ 3.) Sometime after the incident, Wood spoke with Clemente on the phone and told him that he did not remember seeing aircraft tied down at Atlantic during his short time there. (*Id.* ¶ 4.) However, Wood later confirmed that, as of July 5, 2022 when Clemente arrived at Atlantic, and at all relevant times, Atlantic had aircraft tie-down capabilities. (*Id.* ¶ 5.)

The court finds that there is no material factual dispute as to whether Atlantic had and offered tie-down services. In addition, for purposes of the Motion for Partial Summary Judgment, the court accepts as true the plaintiff's statement that Atlantic's employees promised him that they would ensure that his aircraft was tied down and then failed to do so. Those promises, however, were not statements of "material past or present fact," as required to state a claim for negligent misrepresentation. *Pryority P'ship*, 2021 WL 915607, at *3. They were, instead, statements regarding "future events" that the Atlantic employees negligently failed to effect.[7]

Because the plaintiff lacks evidence of a material element of the claim, Atlantic is entitled to judgment on the negligent misrepresentation claim.

### B.    TCPA Claim

The TCPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part." Tenn. Code Ann. § 47-18-109(a)(1). "To establish a *prima facie* case, the plaintiff must present evidence (1) that the defendant "engaged in 'an unfair or deceptive act or practice described in § 47-18-104(b)' and (2) that the defendant's conduct caused an 'ascertainable loss of money or property.'" *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 581 (Tenn. Ct. App. 2024) (quoting Tenn. Code Ann. § 47-18-901(a)(1)); *see also Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005).

---

[7] Moreover, as indicated above, *see* Note 4, the mere fact that the employees failed to perform as promised is not, standing alone, evidence that they made such promises without intent to perform, as would be required to support a claim of promissory fraud. *Isaac*, 2011 WL 2176578, at *6.

Section 47-18-104(b) provides a lengthy list of practices that are "unfair or deceptive" under the TCPA.[8] "[T]he standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts. However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Morrison v. Allen*, 338 S.W.3d 417, 439 (Tenn. 2011) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005)).

Clemente's TCPA claim is based on the same facts as the negligent misrepresentation claim. The plaintiff alleges simply that he was "told . . . that the aircraft would be tied down," but "[t]he aircraft was not tied down." (Compl. ¶¶ 36–37.) He also asserts that the defendant "engaged in deceptive acts in violation of the [TCPA] by representing services of a particular standard." (*Id.* ¶ 35.) In answer to an interrogatory asking him to identify which subsections of the TCPA he contends that Atlantic violated, Clemente responded: "Defendant violated sections 7, 12 and 14 in subsection (b)." (Doc. No. 20-5 at 7 ¶ 23.) These provisions make the following conduct unlawful:

> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> . . . .
>
> (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;
>
> . . . .
>
> (14) Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;

---

[8] One of these is a catch-all provision that makes it unlawful to engage in "any other act or practice which is deceptive to the consumer or to any other person," but provides that "enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter." Tenn. Code Ann. § 47-18-104(b)(27).

Tenn. Code Ann. § 47-18-104(b)(7), (12), (14).

Atlantic argues that the conduct alleged here—promises that Atlantic's employees negligently failed to keep due to sheer laziness or distraction—do not qualify as "unfair or deceptive" acts under any provision of the TCPA. (Doc. No. 21 at 10.) The plaintiff's only argument in response is that, "[i]f defendant did not have tie down services" when its employees told the plaintiff that the aircraft would be tied down, then this was a violation of the above-referenced subsections of the TCPA.

Because it is undisputed that Atlantic did, in fact, have tie-down services, the defendant's negligence in failing to follow through with promises to tie down the plaintiff's aircraft does not qualify as an "unfair or deceptive" practice made unlawful by the TCPA. The defendant is entitled to summary judgment on this claim as well. Because the plaintiff cannot recover under the TCPA, he also will not be entitled to treble damages and attorney's fees under the TCPA.

### C.     Bailment

Under Tennessee law, "[a] bailment is a delivery of personalty for a particular purpose or on mere deposit, on a contract expressed or implied, that after the purpose has been fulfilled it shall be re-delivered to the person who delivered it or otherwise dealt with according to his direction or kept until he reclaims it." *Aegis Investigative Grp. v. Metro. Gov't*, 98 S.W.3d 159, 162–63 (Tenn. Ct. App. 2002) (citing *Merritt v. Nationwide Warehouse Co.*, 605 S.W.2d 250 (Tenn. Ct. App. 1980)). "[B]ailees are not owners of the property, but merely temporary possessors." *Meade v. Paducah Nissan, LLC*, No. M2021-00563-COA-R3-CV, 2022 WL 2069160, at *4 (Tenn. Ct. App. June 9, 2022) (citations omitted).

The plaintiff "has the burden of proving all 'the legal requirements of the traditional bailment for hire.'" *Stewart v. HCA Health Servs. of Tennessee, Inc.*, No. 01A01-9603-CV-00111, 1997 WL 803690, at *4 (Tenn. Ct. App. Dec. 30, 1997) (quoting *Allen v. Hyatt Regency-Nashville*

*Hotel*, 668 S.W.2d 286, 290 (Tenn. 1984)). At the same time, although bailment is a creature of the common law, a Tennessee statute provides that,

> [i]n all actions by a bailor against a bailee for loss or damage to personal property, proof by the bailor that the property was delivered to the bailee in good condition and that it was not returned or redelivered according to the contract, or that it was returned or redelivered in a damaged condition, shall constitute *prima facie* evidence that the bailee was negligent, provided the loss or damage was not due to the inherent nature of the property bailed.

Tenn. Code Ann. § 24-5-111. In other words, once the plaintiff establishes that a bailment was created and "makes out *prima facie* case of breach of contract" by showing "delivery of the article to the bailee and the bailee's failure to return it in good condition on demand or as agreed on," the burden of proof shifts to the bailee, who "may escape liability only by affirmatively showing that his failure to redeliver was without his fault." *Jackson v. Metro. Gov't*, 483 S.W.2d 92, 95 (Tenn. 1972); *see also Gruender v. Holt*, 714 F.2d 45, 47 (6th Cir. 1983) ("The bailee will be held liable for failing to deliver the bailed property unless it can show affirmatively that it was not at fault." (citing *Jackson*, 483 S.W.2d at 95)).[9]

Few cases in Tennessee involve airplanes, but there are several addressing whether a bailment was created between automobile owners and the operators of parking garages or lots. The Tennessee Court of Appeals has, in fact, recognized that "[t]he application of bailment principles to 'park and lock' cases"—typically involving the theft of automobiles from parking garages— "ha[s] proved troublesome for the courts." *Stewart*, 1997 WL 803690, at *3 (citing *Allen*, 668

---

[9] *Gruender*, though instructive, is not on point because bailment was presumed in that case, where the plaintiff had left his aircraft with the defendant FBO for repairs, and the plane was stolen while it was in the defendant's possession. Citing Tenn. Code Ann. § 24–5–111, the court found that the FBO's failure to deliver the plane established a *prima facie* case of negligence against it, but it also found that the FBO was not liable, because it had exercised reasonable care under the circumstances to protect the plane and was not responsible for the theft. *Gruender*, 714 F.2d at 47. Notably, the measures the FBO had taken to secure the plane included "tying it down, chocking the wheels, locking the cabin, and removing the keys." *Id.*

S.W.2d at 288). These cases typically turn on the precise facts at issue, with the "pivotal" question being "whether the bailor has sufficiently delivered possession and control to create a bailment." *Id.* (citing *Allen*, 668 S.W.2d at 289). Without such "delivery," the car owner will have a "mere license to park or a lease of a parking space," rather than a bailment. *Id.* (citing *Rhodes v. Pioneer Parking Lot, Inc.*, 501 S.W.2d 569, 570 (Tenn. 1973)).

Thus, for example, in *Jackson*, defendant Metro Nashville, through several Metro employees, operated a parking operation for profit on the grounds of a high school after school hours. The plaintiff paid $1.00 to park his car there while attending the Tennessee State Fair and returned a few hours later to discover that his car had been stolen. He brought suit, alleging that "a contract of bailment existed between complainant and defendants; and that defendants failed to deliver the bailed property to complainant and permitted a misdelivery of the bailed property to occur." *Jackson*, 483 S.W.2d at 94. The defendants maintained that motorists parking on the school campus simply paid "a charge for the license or privilege" of parking there. The trial court dismissed the claim, but the Tennessee Supreme Court reversed, noting that, when the plaintiff arrived at the lot, he paid his one dollar fee to gain admittance to the lot and was directed to a parking spot by a student. The plaintiff parked and locked his car. When he returned, the lot was unattended and his car was gone. There were "no signs on the parking lot relating to the terms and conditions of parking, liability or limitations of liability, closing hours or hours during which the lot would be open but unsupervised," and the proof established that, without a key, the plaintiff's car could not be started "unless the hood is raised and a jumper cable is inserted in the electrical system, by-passing the ignition lock system." *Id.* Based only on these facts, the court held that a "bailment for hire contract was impliedly created when complainant left his automobile in the custody and control of defendants and this relinquishment of possession was accepted by

defendants." *Id.* at 95. Further, "[b]y their conduct defendants impliedly promised to use ordinary and reasonable care to preserve the property during the term of the bailment and to return the bailed property to complainant on demand or to his order." *Id.*; *accord Allen v. Hyatt Regency-Nashville Hotel*, 668 S.W.2d at 289 (finding that a bailment for hire was created where the plaintiff drove her vehicle into the defendant's enclosed, indoor, attended, commercial garage, with an attendant controlling exit and regular security personnel to patrol the premises for safety, such that, upon proof of nondelivery, the plaintiff was entitled to a statutory presumption of negligence).

Conversely, in *Rhodes*, the defendant parking lot operated a "'self-service Park & lock' operation," pursuant to which the plaintiff pulled into the lot after putting fifty cents in a ticket meter at the entrance to the lot and receiving a ticket. *Rhodes*, 501 S.W.2d at 569. The plaintiff parked his car, placed the ticket on the dash, locked his car and left it, keeping the keys. When he returned to retrieve his car, he discovered that it had been stolen. He recovered it a few days later "in a stripped condition" and brought suit to recover the value of his car. The trial court found that a bailment existed, but the Tennessee Supreme Court reversed, stating:

> we find no evidence to justify a finding that the plaintiff delivered his car into the custody of the defendant, nor do we find any act or conduct upon the defendant's part which would justify a reasonable person believing that an obligation of bailment had been assumed by the defendant. To the contrary, the facts show that the plaintiff at no time left his car in defendant's possession and control. Plaintiff paid the designated parking fee by depositing the money in the ticket meter. He drove his car into the parking lot, undirected and unsupervised by defendant, and chose a parking space within the lot suitable to himself. Plaintiff then parked and locked the car, retaining the key. At no time did plaintiff come into [contact] with any of defendant's employees, nor was plaintiff required to contact an employee of the defendant on taking his car from the parking lot. It necessarily follows, therefore, that there was no bailor-bailee relationship established between the plaintiff and the defendant.

*Id.* at 571.

Similarly, in *Stewart*, the Tennessee Court of Appeals found no contract for bailment in the case of a motorcycle owner who brought suit against a hospital after his motorcycle was stolen

from the hospital parking garage. There, the hospital provided parking in the garage to the public at no charge. *Stewart*, 1997 WL 803690, at *1. Comparing the facts before it to those in *Jackson* and *Rhodes*, among others, the court focused on the facts that no fee was charged and the garage did not "exercise[] actual control over the vehicle in some fashion." *Id.* at *3. As the court stated:

> Parkview Hospital permitted anyone to park in its garage for free and did not undertake to control access to the garage. Hospital employees did not supervise the vehicles entering or leaving the garage and did not undertake to maintain the security of the vehicles parked in the garage. Mr. Stewart did not interact with any hospital employees when he parked in the garage, and in fact, there is no evidence that any hospital employee even knew that he was parking there. He parked where he pleased; he had complete, unrestricted access to his motorcycle; and he kept his own keys.

*Id.* at *4. On these facts, the court found the bailment claim "weaker" than that in *Rhodes* and affirmed summary judgment for the hospital. *Id.*

In the present case, Atlantic moves for summary judgment, arguing that the plaintiff has presented insufficient proof that the aircraft was "fully transferred from Plaintiff to Atlantic." (Doc. No. 21 at 11.) It argues that, in the absence of a written contract, the existence of a bailment "depends on there being a full transfer of the property into the bailee's sole possession and control, even to the exclusion of the bailor." (*Id.* (citing *Rhodes*, 501 S.W.2d at 570).) In this case, the plaintiff himself testified that nothing prevented him from returning to Atlantic at any point to collect his plane and affirmatively stated, "the [airplane] is your property, and they are the FBO." (*Id.* at 12 (quoting Clemente Dep. 53.) According to Atlantic, this testimony establishes that there "was not a full transfer of the airplane such that Atlantic had possession and control to the exclusion of all others including Plaintiff." (*Id.* at 12–13.)[10]

_____

[10] Atlantic cites this court's opinion in *Executive Jet, LLC v. AirTran Airways, Inc.*, No. 3:10-cv-00710, 2013 WL 2250599 (M.D. Tenn. May 22, 2013), granting summary judgment for Atlantic in another negligence case, based on the plaintiff's failure to establish a bailment. In that case, however, Atlantic simply moved the plaintiff's aircraft to park it in front of Stevens Aviation's facility, where the plaintiff's aircraft was scheduled to undergo maintenance the next

In his cursory response, the plaintiff asserts that his situation is more similar to that in *Allen* than *Rhodes* or *Executive Jet* and that he turned his aircraft over to Atlantic on July 5, 2022 to attend a three-day conference. (Doc. No. 22-2 at 4.)

Despite the plaintiff's failure to offer any analysis of the facts, the court finds that there is at the very least a question of fact as to whether a bailment was created in this case. Regarding the fact that the plaintiff himself acknowledged that he had the ability to access and even remove his airplane at any time while it was parked at Atlantic, the same was true of the plaintiffs' vehicles in *Allen* and *Jackson*, where the Tennessee Supreme Court found bailments to have been created. In addition, according to the plaintiff, when he arrived at Atlantic, Atlantic employees told him where to park, and, when he asked if he could tie the plane down, he was told, "No, you have to park it here." (Clemente Dep. 31.) When he reiterated his concern that the aircraft be tied down, the same employee told him to "Leave it here. We're going to take care of you." (*Id.*) Heath Chandler R.'s written statement indicates that the plaintiff's airplane was moved from where he parked it to "Hill 3," where it was "triple-chocked and coned." (Doc. No. 20-1 at 4.) The plaintiff's version of his interaction with the defendant's employees, combined with the suggestion that Atlantic moved the aircraft from where the plaintiff first parked it before chocking it, provides clear evidence that Atlantic took delivery of, and exercised control over, the aircraft. Moreover, although it is undisputed that Atlantic ultimately did not charge the plaintiff a "ramp" fee, under normal circumstances the plaintiff would have paid a ramp and tie-down fee, along with the cost of refueling, upon his departure. (Clemente Dep. 43, 44.)

---

day. There was no evidence that the aircraft was actually delivered to Atlantic's exclusive control, particularly since Stevens Aviation was to perform maintenance services on it the next day, or that the plaintiff paid it a fee in exchange for such delivery. *See id.* at *5.

This case, that is, differs significantly from *Rhodes* and *Stewart*, in which the plaintiffs never interacted with any employees of the defendants and never relinquished control of their vehicles. The facts presented here are more similar to—and appear to weigh even more strongly in favor of the plaintiff than—those in *Jackson*. The plaintiff's version of events, which the court must accept as true at this juncture, establishes that the plaintiff delivered his aircraft into Atlantic's control, that Atlantic undertook to exercise actual control over the aircraft when it moved and chocked it (but did not tie it down), and that Atlantic expected to be paid for its services. The defendant is not entitled to summary judgment on the plaintiff's bailment claim.

**D.     Damages for Loss of Use and Diminution in Value**

The defendant next argues that the plaintiff has failed to present evidence that he experienced any out-of-pocket damages for which he would be entitled to compensation for loss of use and that he affirmatively averred during his deposition that his airplane has not (or ultimately, once repaired, will not have) lost value as a result of the incident. (Doc. No. 21 at 14–15.) It also argues that the plaintiff cannot prove damages for loss of use or diminution in the value of the aircraft without expert testimony and that the plaintiff did not identify an expert by the November 15, 2024 deadline established by the Case Management Order in effect in this case. (*Id.* at 15.) The entirety of the plaintiff's response to these arguments is that the "aircraft has not been fully repaired, and there is still a genuine element of material fact to be considered." (Doc. No. 22-2 at 4.)

### 1.     *Loss of Use Damages*

In Tennessee, the measure of damage to personal property is as follows:

> If the damages have been repaired or the property is capable of repair so that the three factors of function, appearance, and value have been or will be restored to substantially the same value as before the incident, then the measure of damages is the reasonable cost of repairs necessary for the restoration plus any loss of use pending the repairs.

> If . . . the property is not capable of repair so as to restore function, appearance, and value as they were immediately before the incident, then the measure of damages is the difference in the fair market value of the property immediately before the incident and immediately after the incident.

*Prewitt v. Brown*, 525 S.W.3d 616, 623 (Tenn. Ct. App. 2017) (quoting *Tire Shredders, Inc. v. ERM–N. Cent., Inc.*, 15 S.W.3d 849, 855 (Tenn. Ct. App. 1999)).

In *Prewitt*, the court affirmed the dismissal of the plaintiff's claim for loss of use damages where she failed to present evidence that she had "incur[ed] a specific expense or sustain[ed] damages for the loss of use of her car." *Id.* at 625. The court also emphasized that "[t]he purpose of awarding damages is to compensate for damages actually incurred, not to provide a plaintiff with a windfall." *Id.* (citing *Corp. Air Fleet of Tennessee, Inc. v. Gates Learjet, Inc.*, 589 F. Supp. 1076, 1082 (M.D. Tenn. 1984)).

In *Corporate Air Fleet*, the court held that the plaintiff, the owner of a commercial aircraft, could "recover damages for the loss of use of its aircraft due to the negligence of the defendant based upon the reasonable rental value of a substitute aircraft" but that "such a recovery is limited to the time in which a substitute plane was actually rented." *Corp. Air Fleet*, 589 F. Supp. at 1082; *see id.* ("[P]laintiffs cannot be awarded damages for losses they did not incur.").

In this case, the plaintiff testified that he has not rented any substitute aircraft while his aircraft has been undergoing repairs and has not incurred any expenses related to same. (Clemente Dep. 82–85.) Under Tennessee law, he "cannot be awarded damages for losses [he] did not incur." *Id.* The defendant is entitled to summary judgment on the plaintiff's claim for loss of use damages.

### 2. Diminution in Value

The court would be inclined to agree with the defendant that expert testimony would be necessary to establish that the aircraft suffered any diminution in value as a result of the incident. Even if the court accepts the plaintiff's testimony on this topic, however, the plaintiff himself

affirmatively established that the aircraft, once repaired, will not have diminished in value. (*See Clemente Dep.* at 86 ("[O]nce we get [the repairs] completed she [the aircraft] will be back to her full value and full glory.").)

More to the point, as set forth above, the measure of damages to personal property in Tennessee depends upon whether the property can be repaired. If repaired or "capable of repair so that the three factors of function, appearance, *and value* have been or will be restored to substantially the same value as before the incident, then the measure of damages is the reasonable cost of repairs necessary for the restoration plus any loss of use pending the repairs." *Prewitt*, 525 S.W.3d at 623 (emphasis added). Here, the plaintiff's testimony establishes that repairs are capable of restoring the aircraft to "substantially the same value as before the incident," so his damages will be limited to the reasonable cost of repairs. *Id.*

Only if the aircraft were damaged beyond repair, such that it would be impossible to "restore function, appearance, and value as they were immediately before the incident," would "the measure of damages [be] the difference in the fair market value of the property immediately before the incident and immediately after the incident." *Id.* This provision does not apply, because the plaintiff testified that the aircraft can be fully restored.

In short, the plaintiff will not be entitled to recover damages based on diminution in value, having failed to establish the existence of such damages. The defendant is entitled to summary judgment on this issue as well.

## V.      CONCLUSION

For the reasons set forth herein, the defendant's Motion for Partial Summary Judgment will be granted with respect to the plaintiff's negligent misrepresentation and TCPA claims, and as to his claims for damages related to his loss of use of the aircraft during repairs and diminution in the

value of the aircraft. The motion will be denied as to the plaintiff's bailment claim. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge